**UNITED STATES DISTRICT COURT FOR THE**

**NORTHERN DISTRICT OF TEXAS**

**DALLAS DIVISION**

| | | |
|---|---|---|
| **SHERMAN D. MARSHALL III** | § § § | |
| **Plaintiff,** | § § § | |
| **v.** | § § § | **No.** _____ |
| | § § | |
| **WELLS FARGO BANK, N.A** **Defendant.** | § § | |

_____

**PLAINTIFF'S ORIGINAL COMPLAINT**

COMES NOW, Plaintiff, Sherman Marshall III, hereinafter referred to as Plaintiff or "Marshall" and complains of discriminatory employment practices of Defendant, Wells Fargo Bank, N.A., hereinafter referred to as Defendant or "WF" and would respectfully show the Court as follows:

**A. Nature of Action**

1. This is an employment discrimination case brought pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 USC, §2000e, et seq.

**B. Parties**

2. Plaintiff is a 35-year-old black (African American) male, former military, is a United States Citizen, and a resident of Dallas County, Texas. He is a professional software engineer who was employed

by K-Force Staffing (non-party) to provide services for Defendant from February 2023 through August 11, 2023.

3. Defendant is a Wells Fargo Bank, N.A., a foreign corporation organized and existing under the law of the state of California, and is registered with the Texas Secretary of State to transact business in the State of Texas. Defendant Wells Fargo may be served with process by and through its registered agent, Corporation Service Company dba CSC-Lawyers Incorporating Service Company, located at 211 E 7th Street, Austin, Texas 78701-3218, or wherever it may be found.

### C. Jurisdiction and Venue

4. This court has jurisdiction of Plaintiff's claims brought under federal law pursuant to 28 USC, §1331 and 42 USC §2000e-2.

5. All applicable administrative remedies have been exhausted. Plaintiff filed a charge of discrimination with EEOC on January 22, 2024, which was later amended on February 15, 2024, and he received notice of right to sue from EEOC on February 20, 2024. Attached hereto as Exhibit A is a true and correct copy of this notice. The original complaint is timely filed.

### D. Relevant Facts & Background

6. Plaintiff's primary occupation is that of a Software Engineer. As a contractor for K-Force, he was placed in a position of employment for the benefit of Defendant Wells Fargo. Prior to his placement at Wells Fargo, Plaintiff was advised that due to his exemplary background and professional expertise in working for other financial institutions such as Goldman Sachs and JP Morgan Chase, his contract period with K-Force was likely to be shorter than usual and that he could expect to be hired on full time by WF quicker than usual. Having been solicited with the offer of quicker full-time employment, better pay, and better benefits, Plaintiff selected to work for WF over other places of employment, some of which were higher paying or had better benefits.

7.  The specific project in which he was tasked with working on for WF originally was called "Wires" and it was an early component of CCBP (cross-channel banking platform) which was intended to replace legacy software over 20 years old.  The teams in which he worked with stretched across America and collaborated with the team in India. Ultimately, after an issue where management was believed to have discriminated against a fellow coworker, Plaintiff requested to be moved to another team, and was placed on DCBS (Debit Card Business Services), focused on a different component of CCBP.

8.  Shortly after starting with WF, Plaintiff began experiencing discriminatory behaviors from employees and contractors of non-American descent.  Further, the non-American counterparts of management began ignoring or engaged in pacifist behaviors upon Plaintiff's complaints of discriminatory acts. Other non-American counterparts supported the management. After having worked for WF for a few months, it became apparent that the discriminatory acts were deliberately enacted by team and management of non-American descent to create a hostile work environment as to all non-American employees and workers, not just himself.

9.  Additionally, temporary workers and contractors, such as himself, were promoted if they were of non-American origin, even if they were not qualified for the job they were hired to do. Additionally, those who were of non-American descent, whether working in the US or on the India team were given preferential treatment and not penalized as the American workers were, like Plaintiff.

10. The various actors and acts can only be summarized as follows: Wells Fargo software engineering positions are held by 80% of foreign persons. Additionally, the management decisions, and division of labor in engineering comes uniformly from foreign persons. Despite having extensive experience, and technical knowledge, Plaintiff was routinely dismissed by management, even when pointing out critical flaws in systems, and was ultimately replaced by an individual of foreign descent.

11. Overall, the discrimination exhibited by those employees of foreign descent was evidenced by repeated preferential treatment to those who were of similar origin. In one instance, an otherwise very professional individual cracked a joke that *non-American last names were too long, and "I" was how you could tell they were non-American*.  Likewise, any US Citizen who looked different or was of military background was scrutinized, subjected to hostile work conditions, or tasked with work that could only result in failures. The following persons and actions were involved in the ethnic discriminatory practices of Wells Fargo:

12. Ravi Kiran (Kaushik) Yeleswarapu: Senior/lead engineer. Plaintiff was excluded from critical conversations with this individual and other teams, preventing Plaintiff from being able to understand his role in designing software pertaining to the user experience, and greater complexity of the software architecture. As the engineering behind CCBP was largely unknown to Plaintiff and his team, Plaintiff repeatedly asked Kaushik for more involvement in the fundamentals; but was denied opportunities for engagement, and as a result, created a bottleneck for production and Plaintiff's assigned goals.

13. Gopi Yarlagadda: Software Architect. Plaintiff worked with this individual extensively. Gopi tasked Plaintiff several times with very high-level objectives, independent of assigned work. However, these tasks were initially complicated by Talat Shaikh, whose views about necessary solutions were the source of disputes between Plaintiff, Talat, Gopi, Keith, and other senior personnel. Gopi ultimately validated Plaintiff's knowledge and concerns for the welfare of the application, despite favoring Talat.

14. Talat Shaikh: Lead Engineer. Talat repeatedly instructed Plaintiff to do something in error, which became the subject of a debate during the team's meetings.  Plaintiff began to scrutinize Talat's work independently, which lead to the discovery of Talat having engineering discussions without Plaintiff and therefore creating repeated opportunities for Plaintiff's failure, and delaying the progress of team objectives. Plaintiff realized several very significant problems with the way the team's application was being built and brought this to the attention of the management, not out of

spite pertaining to Talat, but in the spirit of collaboration so that the entire team would meet their goals. Talat Shaikh had been with Wells Fargo for less than 2 years at the time of dispute, had previously been a contractor, and was hired ultimately. He was given preferential treatment and included in various meetings and planning activities which Plaintiff was not. This became problematic, ultimately, because Talat and Plaintiff had several disagreements about the engineering features/components. Talat was able to circumvent corporate controls, submitting incomplete/error-ridden work which ultimately passed company compliance checks, despite complaints by Plaintiff regarding such.

15. Keith Ishibashi: Project Manager of DCBS team. Keith focused on the timeframe of tasks, per his role as Project Manager. He repeatedly denied Plaintiff any opportunity to be a part of the planning of the team schedule and suggested that contractors would not be contributing and therefore Plaintiff's input, nor any other contractors' input was necessary. Ultimately, Keith had favoring discussions with Talat Shaikh independent of Plaintiff, and this led to work which was scheduled, and then reversed, because of incomplete foundations, neglected priorities, and poor engineering practices. Despite Keith's consistent assertion that engineering concerns were "too technical for him," he stubbornly preferred the corporate schedule over a focus on engineering priorities which had not been addressed. This led to several disputes between Plaintiff, Keith, and several other team members.

16. Leilani Young: Scrum Master of DCBS team. Leilani counseled Plaintiff at least twice regarding the problems Plaintiff was having with Talat. Her concern was about how "harsh" Plaintiff was, and the concerns about Talat's emotional well-being for being challenged on a professional basis. Leilani supported the teammates of foreign descent, in practice, while being a member of Plaintiff's team. She was keen to indicate the hierarchy of authority, especially when Plaintiff criticized the DCBS design after realizing and pointing out Talat's errors. Ultimately, after conferring with Gopi, she supported Plaintiff in proposing and contributing to an alternative schedule, which was never supported by Keith.

17. Mohammed Ansari: Lead Infrastructure Engineer. Mohammed was responsible for a bug in the deployment environment, which cost several engineers–including Plaintiff, an extensive amount of time to resolve. Mohammed refused to meet with Plaintiff repeatedly, which prevented Plaintiff from understanding the bug, nor from changing it, despite agreement from others that the logic he introduced added no value–and, was in fact, detrimental. Mohammed was very involved in the deployment pipelines, which had its own set of problems. Mohammed was involved in configuring the fundamental infrastructure for the new Data Centers Wells Fargo was constructing, work which was very behind schedule for unknown reasons, and which had begun to affect our ability to make progress.

18. Sharan Raj Ys I: Senior Architect. Sharan was responsible for the designs of CCBP. He worked out of India, and very rarely communicated with Plaintiff's teams outside of very formal design reviews, where alternatives were never permitted, despite discussion from Gopi and other senior personnel regarding their merits. Sharan had a close working relationship with Gopi, Raghu, and other associates involved in the infrastructure like Kafka, Team member attributes, and the deployment pipelines.

19. Siavash Moeini: Siavash was ultimately hired into the company after being a contractor/intern. His initial role was an intern for particular hiring program. Often, Plaintiff was asked to explain things in a way to ensure Siavash understood, and to come up with tasks specifically for him, or at times, to relinquish important work to him.  Despite Siavash being an intern/contractor, he was ultimately hired, even though he relied extensively on the help of others, like Plaintiff, to do his job.

20. Zachary Trembly, Software Engineer. Zachary was a US Citizen and like Plaintiff, was a veteran, and like Plaintiff, suffered from adverse discrimination and was terminated well before the end of his contract.  Like Plaintiff, he was belittled by management, and ultimately given a task which he couldn't perform (fixing a bug occurring in an outdated version of Internet Explorer, which the company was scheduled to no longer support in the near future). Plaintiff stood up for Zachary, and

tried to persuade management that it was an inefficient use of Zachary's time, and that a focus on the new deployment environment (Microsoft Edge) was preferable; however, they were obstinate, and ultimately terminated him for failure to fix an issue that was not actually an issue.

21. Software engineering operations is predominantly foreign as to the personnel who worked in this field. Those who were of non-American/similar descent received special treatment, were not required to provide the same level of effort as Plaintiff and were allowed to submit incomplete work by employing "work-arounds" by manipulating the systems to permit the programs to function despite error/omission.

22. Plaintiff, understanding the regulatory and sensitive nature of this work recognized these issues to be a red flag, and which should never occur. It indicates tolerance/oversight of error, and influences on our work that are illegitimate, and out of compliance.  Talat Shaikh was supposed to have been responsible for the majority of activities before Plaintiff joined the team, but it became clear that Talat had neglected these directives entirely. Plaintiff had to extensively redesign the work Talat was supposed to have been responsible for; however, this problem became exacerbated by management being unwilling to include Plaintiff in future planning.

### E. Legal Principles

23. Defendant's ethnic cleansing of its Software Engineers constitutes illegal discrimination based on race, color, national origin, or ethnicity.  Plaintiff and other American employees were systematically removed from the teams and replaced with employees of non-American/foreign descent.  Plaintiff and others like him were systematically subjected to more difficult and onerous working conditions than non-American employees.  Plaintiff was subjected to a hostile work environment because of his race, color, national origin, and quite possibly because he was a military veteran and jeopardized continuity of employment due to his demographic.  Plaintiff makes disparate treatment and disparate impact race, color, and national origin discrimination claims against Defendant under 42 USC §2000e-2.

**F. Remedies and Damages**

24. Plaintiff sues to recover his legal and equitable remedies under the employment discrimination statutes cited in this complaint.  These remedies include:

    a.   Compensatory Damages, including but not limited to compensation for injury to future earning capacity, mental anguish, and emotional distress,

    b.   Costs of court,

    c.   Prejudgment and post judgment interest allowed by law, and

    d.   Attorney fees and litigation expenses, including expert witness fees.

**G. Jury Demand**

25. Plaintiff demands a trial by jury.

**H. Prayer**

26. Plaintiff prays that this Court issue a summons to Defendant, and it be summoned to appear and answer herein, and upon final hearing Plaintiff have a judgment of and from Defendant for liability, damages, and equitable relief as herein alleged, and for such other and further relief as the Court may deem just and proper.

Date: May 14, 2024                Respectfully Submitted,

                         /s/ Joslyn R. Smith
                         Joslyn R. Smith
                         State Bar No.: 24117080
                         Law Office of J.R. Smith
                         4805 Neptune Court,
                         Flower Mound, Texas 75022
                         682-900-1799 (telephone)
                         js@lojrs.com (email)
                         Attorney for Plaintiff

**EXHIBIT A**